# IN THE UNITED STATES DISTRIT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. _____**

**Integrity Medical Management, LLC,**

        **Plaintiff,**

v.

**Surgical Center at Premier, LLC;**
**Surgical Care Affiliates, LLC;**
**Brian Shelton; and**
**Michael Simpson**

        **Defendants.**

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

TO THE HONORABLE JUDGE OF SAID COURT:

    Plaintiff Integrity Medical Management, LLC files this Original Complaint and would respectfully show the Court as follows:

### I.   PARTIES

    1.   Plaintiff Integrity Medical Management, LLC (hereafter, "IMM") is a Texas limited liability company, with its headquarters and principal place of business in Texas.

    2.   Defendant Surgical Center at Premier (hereafter, "SCAP") is a Tennessee limited liability company with its principal place of business in Colorado, and service may be made at 3920 North Union Boulevard, Suite 240, Colorado Springs, Colorado, 80907, which is the

designated registered agent at the above address.

3.     Defendant Surgical Care Affiliates, LLC (hereafter, "SCA"), is a Delaware LLC with its place of business in Alabama, and may be served at the Corporation Company, 1675 Broadway, Suite #1200, Denver, CO 80202.

4.     Defendant Brian Shelton is an individual who is vice president of operations at Defendant SCA. Defendant Brian Shelton can be served at 3920 North Union Boulevard, Suite 240, Colorado Springs, Colorado, 80907.

5.     Defendant Michael Simpson is an individual and manager of AB&U Surgery Center, LLC and may be served at 3920 North Union Boulevard, Suite 330, Colorado Springs, Colorado, 80907.

## II.     JURISDICTION AND VENUE

6.     IMM's sole member is Lewis Nichols, who is a citizen of Texas.  Accordingly, IMM is a citizen of Texas for jurisdictional purposes. *Hale v. MasterSoft Int'l Pty., Ltd.*, 93 F. Supp. 2d 1108, 1112 (D. Colo. 2000).

7.     Upon information and belief, SCA is the wholly-owned subsidiary of Surgical Care Affiliates, Inc.  Surgical Care Affiliates, Inc. is an Illinois corporation with its principal place of business in Alabama, and so is a citizen of both Illinois and Alabama.  28 U.S.C. § 1332(c). Accordingly, defendant SCA is a citizen of Illinois and Alabama. *See, e.g., Hale v. MasterSoft Int'l Pty., Ltd.*, 93 F. Supp. 2d 1108, 1112 (D. Colo. 2000).

8.     Upon information and belief, SCAP has two members which are Defendant SCA and AB&U Surgery Center, LLC ("AB&U"). SCA is a citizen of Illinois and Alabama. AB&U is a Colorado limited liability company. Upon information and belief, the members of AB&U

Surgery Center are physicians who are citizens of Colorado. Accordingly, SCAP is a citizen of Illinois, Alabama, and Colorado.

9. Upon information and belief, Brian Shelton and Michael Simpson are citizens of Colorado.

10. Jurisdiction is proper because no defendant shares citizenship with Plaintiff IMM, and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). Jurisdiction is also proper because, as explained further below, Defendants SCAP, Surgical Care Affiliates, Inc., and Surgical Care Affiliates, LLC have purposefully availed themselves of the benefits of doing business in Colorado. Venue is proper because all or substantially all of the events and omissions giving rise to the claims in this lawsuit, as explained further below, occurred in Colorado Springs, Colorado. 28 U.S.C. § 1391(b)(2).

### III.   JURY TRIAL DEMAND

11. IMM demands a trial by jury.

### IV.   FACTS

12. IMM is a company that provides management and development services for ambulatory surgery centers, short stay hospitals, and other health care facilities. IMM's principal place of business is Austin, Texas, where Lewis Nichols, IMM's principal, resides.

13. At all relevant times herein, Defendant SCAP was an ambulatory surgery center operating in Colorado Springs that focused primarily on outpatient surgeries and related services. At all relevant times herein, Defendant SCA was an outpatient ambulatory surgical care company that operated surgery centers across the country.

### A.     IMM Is Hired to Manage SCAP and Subsequent Ownership Restructure

14.     In early 2012, SCAP was owned by SCA (51%) and AB&U (49%). AB&U hired IMM to provide management services to SCAP via a management agreement effective May 31, 2012. Around this time, IMM also became an owner of AB&U. As part of efforts to restructure SCAP and increase its profitability, IMM was charged with persuading SCA to sell down its ownership in SCAP from 51% to 20%. The management agreement in place at that time provided that, should IMM be successful in persuading SCA to sell down its ownership in SCAP, IMM would have the right to increase its ownership interest in AB&U by an amount corresponding to 20% of AB&U's increased interest in SCAP.

15.     By December 2012, IMM had secured a share repurchase contract, whereby SCA would sell to SCAP 31% of its interest in SCAP, leaving it with 20%. The repurchase would occur in three tranches over 2013 and 2014. The share repurchase price was based on a trailing 12-month earnings before interest, taxes, depreciation, and amortization ("EBITDA").

16.     In order to raise funds for the buyback of the second tranche of shares from SCA, AB&U (acting through Michael Simpson) solicited loans from physician-owners of AB&U in exchange for the chance to buy additional shares in AB&U. AB&U did not offer IMM (an owner as well) the same opportunity. This disparate treatment potentially violated the federal Anti-Kickback Statute.

### B.     IMM's New Management Agreement with SCAP

17.     SCAP and IMM entered into an Amended and Restated Management Agreement ("the Management Agreement"), dated October 16, 2013. This new Management Agreement had an "Initial Term" from April 1, 2013 through June 30, 2015, after which the Agreement would be

extended automatically for successive one-year terms through June 20, 2022.

18.     The Management Agreement at Section 4.01 determines IMM's compensation via a complex calculation based on SCAP's anticipated annual profits beyond the net profits of a 2011 "base period." Notably, the profits for the 2011 "base period" were not a "normal year," but were substantially inflated due to the increased work in 2011 by a top revenue-producing doctor who subsequently left SCAP.

19.     The Management Agreement further provides at Section 8.02(c) that either party may terminate the agreement if IMM's management fees as calculated by Section 4.01 do not meet a certain threshold.

**C.    Contemplated SCAP Merger with Audubon**

20.     SCAP is managed by a board of managers pursuant to an operating agreement. In April 2014, there were seven board members. SCA was represented by Brian Shelton and another individual and AB&U was represented by Michael Simpson.

21.     In approximately April 2014, SCAP became interested in pursuing a merger with another surgery center in Colorado Springs – Audubon Ambulatory Surgery Center ("Audubon"). IMM was instructed to focus on facilitating this merger and at the same time implement cost-cutting measures agreed to at a SCAP "summit" in March 2014.

22.     SCAP was hesitant to allow IMM to renegotiate long-term contracts that would have increased SCAP's profitability. The reason for this was because the final tranche of the share repurchase agreement with SCA was approaching, and the price was tied to SCAP's earnings. Accordingly, SCAP desired to keep earnings in check and therefore minimize the share repurchase price. IMM was therefore in a difficult position of being subject to a profitability threshold

contemplated by Section 8.02(c) of the Management Agreement.

23. Accordingly, in April 2014, SCAP, via its board of managers, decided to no longer keep track of and pay IMM's compensation as provided in Section 4.01 of the Management Agreement. Instead, SCAP decided to pay IMM a flat monthly management fee of $15,000 through the end of 2014 for its services, and to induce IMM to forgo certain cost-cutting measures and make the merger (rather than profits) the priority.

24. Lewis Nichols (IMM's representative on the SCAP board of managers) voted in favor of the flat management fee, which passed unanimously. IMM, as the manager of SCAP, was positioned to benefit from the prospective business relationship that would result from the potential merger by serving as the manager of the larger, merged surgical center.

**D.    SCA Desires to Oust IMM and Manage SCAP**

25. On information and belief, SCA was aware of the potential merger with Audubon, and desired to be the manager of any newly created entity instead of IMM. The compensation for the management of the entity created by the merger would greatly exceed the financial value of the Management Agreement between IMM and SCAP. Moreover, the manager of this new entity would have the opportunity to purchase additional shares from the SCAP physician investors prior to the merger, thereby increasing its stake in the merged entity and the amount of its annual distributions.

26. SCA, via its representative Brian Shelton, engaged in subversive actions calculated to end IMM's management relationship with SCAP and prevent IMM from managing any future merged entity. As an example, Brian Shelton represented to the physician investors of SCAP that Audubon preferred that SCA serve as the manager, and not IMM. This representation was false.

### E.   SCA'S Lowball Offers to IMM

27.   As part of the merger negotiations, in April 2014, Value Management Group ("VMG") was hired to value SCAP and Audubon and evaluate a potential merger. Based on VMG's analysis of SCAP's profitability, IMM could expect to earn, in present dollars, approximately $2,400,000 over the term of its Management Agreement with SCAP. All or substantially all of IMM's revenue was profit. Notwithstanding VMG's analysis, in an attempt to remove IMM from any future management relationship with SCAP or the new entity after the merger, SCA offered to buy out IMM's management contract for $750,000. This lowball offer potentially violated the Anti-Kickback Statute, and was rejected.

28.   Around this time, in a further attempt to remove IMM from any future management relationship with SCAP or the new entity after the merger, SCA attempted purchase IMM's shares in SCAP for $900,000. IMM's ownership interest in SCAP was worth substantially more. A buyout at $900,000 would yield returns on investment for IMM that were lower than the physician-owners of SCAP and, thus, potentially violated the federal Anti-Kickback Statute. IMM understandably rejected this lowball offer.

### F.   Merger with Audubon

29.   SCAP decided to move ahead with the merger. In furtherance of this, in October 2014, Michael Simpson decided that AB&U should sell its remaining authorized outstanding shares to its physician owners before any merger occurred. AB&U proceeded with this plan; however, AB&U again withheld the opportunity to IMM, who was also an owner of AB&U. This dilution of IMM's ownership interest in AB&U potentially violated the federal Anti-Kickback Statute.

**G.     No-Notice Meetings Called to Terminate IMM's Management Agreement**

30.     With less than a full workday's notice, or about March 2, 2015, an "emergency" meeting of SCAP's physician investors was called, and an "emergency" SCAP board of managers meeting was called.  With respect to the latter meeting, SCAP failed to comply with its Operating Agreement to call a board of managers meeting, as such meetings require no less than fifteen (15) days' notice.

31.     At the meeting of the physician investors of SCAP, on information and belief, Michael Simpson, a SCAP board member and managing member of AB&U, told the physician investors that the Management Agreement with IMM needed to be terminated to allow a new contract to be negotiated to allow IMM to serve as the manager of the larger surgical center that resulted from the upcoming merger.  This representation was false.  On information and belief, Michael Simpson was acting in concert with SCA, through Brian Shelton, to facilitate a termination of IMM's Management Agreement with SCAP by any means necessary.

32.     At this time, there were seven members of the board of managers of SCAP: Michael Simpson (on behalf of AB&U), Brian Shelton and Tony Kilgore (on behalf of SCA), Lewis Nichols (on behalf of IMM), John Pak, Dan Kopacz, and Tim Hart.  At the board of managers meeting following the physician meeting, SCAP's board voted to terminate IMM's Management Agreement pursuant to Section 8.02(c) of the Management Agreement.  SCAP sent written notice to IMM of the termination, which was to be effective July 1, 2015.  Due to the short notice of the meeting, Lewis Nichols was not able to be present.

33.     In inducing the decision to terminate IMM's Management Agreement, Brian Shelton assured the SCAP board of managers in writing that SCA would indemnify SCAP and its

8

board of managers for all legal costs incurred as a result of such decision to terminate the Management Agreement with IMM. On information and belief, SCA also offered this indemnification protection to SCAP and its board of manager members prior to the March 2nd meeting. SCA made this offer to induce SCAP to terminate the Management Agreement. The above actions potentially violated the Anti-Kickback Statute.

34. SCA controlled two out of seven votes on the SCAP board. Under the SCAP member operating agreement, six votes are required to approve any merger. On information and belief, SCA, acting through Brian Shelton, further induced SCAP to breach the Management Agreement with IMM by threatening to withhold the necessary board votes to approve the future merger if SCAP did not end its relationship with IMM.

35. Michael Simpson and Brian Shelton engaged in the above actions and other actions that will be proven at trial in their capacity as member-managers of SCAP.

36. SCA has since taken over management of the merged entity, to its benefit.

37. At all relevant times, SCA's conduct was motivated by its own self-interest and desire to usurp the role of manager for any merged entity from IMM, who was already managing SCAP, and obtain additional ownership shares. SCA's actions were intentional and improper, not only interfering with IMM's existing contractual relationship with SCAP, but with IMM's prospective business relationship with the newly merged entity involving SCAP. Defendants' conduct described herein disregarded the interests of IMM, and was willful, malicious, and reckless.

38. IMM remained an owner of SCAP until it sold its ownership through a unit purchase agreement effective July 14, 2015.

## V.   CLAIMS

### COUNT ONE:
### Breach of Contract (Defendant SCAP)

39. IMM incorporates the foregoing paragraphs as if fully restated herein.

40. IMM and SCAP were parties to a valid and enforceable contract, the Management Agreement.

41. IMM performed its obligations under the Management Agreement.

42. SCAP's actions and the circumstances surrounding SCAP's decision and agreement to pay IMM a flat management fee during most of 2014 constitute an amendment of, or, alternatively, a waiver of its right to terminate the Management Agreement under Section 8.02(c) of the Management Agreement. Alternatively, SCAP is equitably estopped from asserting its termination right under Section 8.02(c).

43. SCAP breached its obligations by terminating the Management Agreement without justification as set forth above.

44. Alternatively, under Section 8.02(c) of the Management Agreement, SCAP may not give notice to terminate the Management Agreement prior to January 1, 2016, and, because of the required 120 day notice, could not therefore cause a termination to occur prior to April 30, 2016.

45. For these reasons, SCAP breached the Management Agreement by terminating it effective July 1, 2015.

46. As a result of SCAP's breach(es), IMM has suffered damages which are continuing, in an amount to be proven at trial.

## COUNT TWO:
**Breach of the Duty of Good Faith and Fair Dealing (Defendant SCAP)**

47. IMM incorporates the foregoing paragraphs as if fully restated herein.

48. IMM and SCAP were parties to a valid and enforceable contract, the Management Agreement, which created on the part of SCAP a duty of good faith and fair dealing.

49. IMM performed its obligations under the contract.

50. SCAP breached its duty of good faith and fair dealing under the contract, by among other actions, manufacturing a baseless ground for terminating its contract with IMM, which belied its own actions undertaken in April 2014.

51. IMM relied upon the covenant of good faith and fair dealing in its performance under the contracts with Defendant SCAP and reasonably and justifiably expected Defendant SCAP would ac in IMM's best interest and not engage in manufacturing baseless grounds for terminating the Management Agreement which caused substantial harm to IMM.

52. SCAP's conduct deprived IMM of the benefit of the Management Agreement.

53. As a result of Defendant SCAP's conduct, IMM has suffered damages which are continuing, in an amount to be proven at trial.

## COUNT THREE:
**Intentional Interference with Contractual Relations**
**(Defendants SCA, Brian Shelton, and Michael Simpson)**

54. IMM incorporates the foregoing paragraphs as if fully restated herein.

55. IMM and SCAP were parties to the Management Agreement, a valid and enforceable contract.

56. SCA, Brain Shelton, and Michael Simpson knew or should have known about this contract.

57. SCA, Brain Shelton, and Michael Simpson intentionally and improperly interfered with IMM's rights under that contract by, among other actions, inducing SCAP not to perform and breach the contract, to IMM's detriment.

58. As a result of SCA, Brain Shelton, and Michael Simpson's conduct, IMM has suffered damages, which are continuing, in an amount to be proven at trial.

59. SCA, Brain Shelton, and Michael Simpson's conduct described above was willful, wanton, malicious, and reckless toward the rights of IMM.

## COUNT FOUR:
### Intentional Interference with Prospective Business/Economic Relations
### (Defendants SCA, Brian Shelton, and Michael Simpson)

60. IMM incorporates the foregoing paragraphs as if fully restated herein.

61. As the manager of SCAP, IMM was in a position to enter into a new contract or amend its existing contract to continue serving as the manager of the entity that would be formed as a result of a merger between SCAP and Audubon.

62. SCA, Brain Shelton, and Michael Simpson intentionally and improperly interfered with the prospective business relationship between IMM and the to-be-formed entity by, among other actions, inducing SCAP to end its current business relationship with IMM and prevent IMM from managing the to-be-formed entity.

63. As a result of SCA, Brain Shelton, and Michael Simpson's conduct, IMM has suffered damages in an amount that will be proven at trial.

64. SCA, Brain Shelton, and Michael Simpson's conduct described above was willful, wanton, malicious, and reckless toward the rights of IMM.

## COUNT FIVE:
## Unjust Enrichment (Defendant SCA)

65. IMM incorporates the foregoing paragraphs as if fully restated herein.

66. At IMM's expense, SCA has received a benefit in the form of a profitable management contract with the surviving entity following the merger of SCAP and another surgery center.

67. SCA acted wrongfully in obtaining this benefit. Under these circumstances, it would be unjust for SCA to retain this benefit without compensating IMM.

## COUNT SIX:
## Breach of Fiduciary Duty
## (Defendants Brian Shelton and Michael Simpson)

68. IMM incorporates the foregoing paragraphs as if fully restated herein.

69. Brian Shelton and Michael Simpson each represented a member-owner of SCAP, LLC on SCAP's board of managers. Due to the low number of members and the lack of marketability of ownership interests in SCAP, SCAP is akin to a close corporation in which the shareholders owe fiduciary duties to each other. *See, e.g., Anderson v. Wilder*, No. E200300460COAR3CV, 2003 WL 22768666, at *7 (Tenn. App. Nov. 21, 2003). Accordingly, Brian Shelton and Michael Simpson owed fiduciary duties of loyalty, honesty, and fairness to IMM, who was a minority owner of SCAP and only controlled a single vote on SCAP's board of managers.

70. By engaging in actions described above including, but not limited to, orchestrating the termination of SCAP's relationship with IMM to the benefit of SCA, failing to comply with the meeting provisions in the SCAP operating agreement, diluting IMM's ownership in AB&U, engaging in other transactions in potential violation of the Anti-Kickback Statute, and generally

oppressing IMM, Brian Shelton and Michael Simpson breached their fiduciary duties owed to minority owner IMM.

71.     As a direct and proximate result of Defendants Shelton and Michael Simpson's breach of their respective fiduciary duties to IMM, IMM suffered damages which are continuing, in an amount to be proven at trial.

### CIVIL CONSPIRACY, RELATING TO COUNTS 3 and 4
### (Defendants SCA, Brian Shelton, and Michael Simpson)

72.     SCA, Brian Shelton, and Michael Simpson had a meeting of the minds as to an object to be accomplished, namely, the termination of IMM's Management Agreement with SCAP and the ouster of IMM from any opportunity to manage the entity resulting from the merger of SCAP and Audubon.

73.     In order to accomplish this object, SCA, Brian Shelton, and Michael Simpson engaged in the overt acts described in Counts 3 and 4. These overt acts constitute unlawful acts. *See Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054-55 (Colo. 1995)

74.     As a proximate result of the unlawful overt acts, IMM suffered damages that will be proven at trial.

75.     Accordingly, SCA, Brian Shelton, and Michael Simpson are jointly and severally liable for these damages. C.R.S. § 13-21-111.5(4).

### CIVIL CONSPIRACY, RELATING TO COUNT 6:
### (Defendants Brian Shelton and Michael Simpson)

76.     Brian Shelton and Michael Simpson had a meeting of the minds as to an object to be accomplished, namely, the termination of IMM's Management Agreement with SCAP and the ouster of IMM from any opportunity to manage the entity resulting from the merger of SCAP and

Audubon.

77. In order to accomplish this object, Brian Shelton and Michael Simpson engaged in the overt acts described in Count 6. These overt acts constitute unlawful acts. *See Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054-55 (Colo. 1995).

78. As a result of the unlawful overt acts, IMM suffered damages that will be proven at trial.

79. Accordingly, Brian Shelton and Michael Simpson are jointly and severally liable for the resulting damages. C.R.S. § 13-21-111.5(4).

## VI.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Integrity Medical Management, LLC hereby prays that this Court would award it all relief, at law and at equity, including but not limited to actual damages, consequential damages, exemplary damages, attorneys' fees, interest, and Court costs, to which it shows itself justly entitled in law or equity.

DATED THIS 9th day of October, 2015

Respectfully submitted,

**HERMS & HERRERA, LLC**

By: */s/ C. Dean Herms Jr.*
C. Dean Herms, Jr., #40698
dean@hhlawoffice.com
Jeffrey B. Cullers, #41969
jeff@hhlawoffice.com
3600 S. College Ave. Suite 204
Fort Collins, CO 80525

                                    ATTORNEYS FOR PLAINTIFF
                                    INTEGRITY MEDICAL
                                    MANAGEMENT, LLC

This above was filed electronically pursuant to Local Rule 5.1(a).The Original was duly executed and is on file at the office of Herms & Herrera, LLC.


Plaintiff's Address
11908 Brookwood Road
Austin, TX 78750