IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-02243-RBJ

INTEGRITY MEDICAL MANAGEMENT, LLC,

      Plaintiff,

v.

SURGICAL CENTER AT PREMIER, LLC,
SURGICAL CARE AFFILIATES, LLC,

      Defendants,

SURGICAL CENTER AT PREMIER, LLC and
SURGICAL CARE AFFILIATES, LLC,

      Counterclaim Plaintiffs,

v.

INTEGRITY MEDICAL MANAGEMENT, LLC,

      Counterclaim Defendant.

---

## ORDER

---

      This order addresses plaintiff Integrity Medical Management, LLC's (IMM) motion for partial summary judgment [ECF No. 108], defendant Surgical Center at Premier, LLC's (Premier) motion for summary judgment [ECF No. 110], and defendant Surgical Care Affiliates, LLC's (SCA) motion for summary judgment [ECF No. 112]. For the reasons stated below, the Court grants IMM's motion in part and denies it in part, grants Premier's motion, and grants

1

SCA's motion.  With all of IMM's claims dismissed, this case will continue to trial only on Premier and SCA's remaining counterclaims.

## BACKGROUND

### A. <u>Facts</u>.

IMM is a Texas company that provides management and development services for healthcare facilities.  ECF No. 1, ¶¶ 1, 12; ECF No. 55 at 14, ¶¶ 2, 7.  Premier owned and operated an ambulatory surgery center in Colorado Springs, Colorado.  ECF No. 1, ¶ 13; ECF No. 55 at 15, ¶ 8.  SCA owned a roughly 20% interest in Premier and had two representatives on Premier's seven-person board of managers.  ECF No. 1, ¶¶ 15, 20; ECF No. 112 at 2.  IMM also had an ownership interest in Premier and had one representative—IMM's chief executive officer Lewis Nichols—on its board.  ECF No. 1, ¶¶ 24, 28; ECF No. 110, Ex. 5; ECF No. 112, Ex. 2, at 151:3–25.

Effective April 1, 2013, IMM and Premier agreed for IMM to manage Premier's surgery center.  ECF No. 55 at 15, ¶¶ 9–10; ECF No. 108 at 3, ¶ 3.  IMM and Premier subsequently entered into an "Amended and Restated Management Agreement" effective October 16, 2013. ECF No. 108, Ex. 1, ¶ 6; ECF No. 127, Ex. 1; ECF No. 127, Ex. 2, at 54:23–25, 55:4–10.  This agreement had an initial term of April 1, 2013 through June 30, 2015.  ECF No. 127, Ex. 1, § 1. Section 8.02(c) of the management agreement allowed the agreement to be terminated without cause, stating:

> Either party may terminate this Agreement for any reason effective as of any date after the end of the Initial Term, provided that (i) the management fee payable to [IMM] pursuant to Section 4.01(a) hereof for the period of two full consecutive calendar quarters . . . ending immediately prior to the date notice of such termination is given is less than $100,000 (i.e. an average of $50,000 per quarter),

and (ii) the terminating Party gives the other Party at least 120 days prior notice of such termination.

*Id.* § 8.02(c). Unless the parties terminated the agreement, it would automatically renew for

successive one-year terms through June 30, 2022. *Id.* § 1.

IMM was to be paid according to a complex formula. Section 4.01(a) specifies that

IMM's annual management fee was a share of Premier's net profits above a baseline level. *Id.* §

4.01(a). Section 4.01(b) provided IMM quarterly payment advances as follows:

Commencing on the date that is 90 days after the Effective Date, and each quarter thereafter during the term of this Agreement, [IMM] will be paid an advance quarterly management fee based on the estimated management fee for the entire year, as determined in good faith from time to time by [Premier's] outside accountant.

*Id.* § 4.01(b). That provision also required overpayments and underpayments of advances to be

reconciled once IMM's actual management fee is calculated:

Promptly upon completion of the financial statements for each calendar year, [Premier] shall cause a final computation of the management fee for such calendar year to be delivered to [IMM]. Within 30 days after the delivery of such statement, [Premier] shall pay [IMM] any excess of the actual management fee over the advances paid during the year, and [IMM] shall pay [Premier] any excess of the advances paid during the year over the actual management fee.

*Id*. Section 8.04 explains that such surplus or deficient advances must also be settled

immediately if the contract is terminated:

Upon any termination of this Agreement, [Premier] shall promptly pay to [IMM] any accrued but unpaid sums due under this Agreement and [IMM] shall promptly pay to [Premier] any accrued but unpaid sums due under this Agreement including but not limited to the excess of the advances paid during the year over the actual management fee pursuant to Section 4.01(b).

*Id.* § 8.04.

Premier's profits did not exceed the baseline level at any time during the contract term, so IMM was not contractually entitled to any payment for its work. *See* ECF No. 55 at 17, ¶ 24; ECF No. 108, Ex. 1, ¶ 10. However, Premier decided to pay IMM $15,000 every month for its services anyway. ECF No. 1, ¶ 23; ECF No. 55 at 17, ¶¶ 23–25. On April 23, 2014 Premier's board of managers held a meeting and ratified these payments. ECF No. 108, Ex. 5; ECF No. 110, Ex. 5. The meeting's minutes state:

> Motion was made by Dan Kopacz to forgive 2013 management shortfall under the management contract, pay IMM $15,000 per month through December 31, 2014 consistent with what IMM has been being [sic] paid without additional true-up under the contract . . . . Motion seconded by John Pak and approved unanimously. Discussion included agreeing to go back to contract calculation in 2015 once all cost-cutting measures had been implemented.

ECF No. 108, Ex. 5.

In April 2014, with more than a year left in IMM's initial term managing Premier's facilities, Premier considered merging with Audubon Ambulatory Surgery Center. ECF No. 1, ¶ 21; ECF No. 55 at 4, ¶ 21. A non-binding letter of intent indicated that SCA rather than IMM would provide management services to the merged entity. ECF No. 1, ¶¶ 24–25; ECF No. 55 at 4, ¶ 25; ECF No. 112, Ex. 3, § 3(d). The letter further stated that Audubon and Premier "shall mutually agree upon the terms and conditions by which the Management Agreement between Premier and [IMM] would be terminated." ECF No. 112, Ex. 3, § 4(d). Premier's board of managers, including IMM's representative, signed this letter of intent. ECF No. 112, Ex. 3, at 7. SCA subsequently offered to buy out the remainder of IMM's management contract with Premier, but IMM rejected the offer. ECF No. 1, ¶ 27; ECF No. 55 at 4, ¶ 27.

With negotiations unsuccessful, Premier's board of managers invoked Section 8.02(c) to terminate the management agreement with IMM. On March 3, 2015 Premier sent IMM a notice

to terminate the agreement 120 days later on July 1, 2015.  ECF No. 55 at 20, ¶¶ 36–37; ECF No. 108, Ex. 7.

### B.  <u>Procedural History</u>.

IMM filed this action on October 9, 2015.  ECF No. 1.  IMM argues that Premier breached their contract and breached the duty of good faith and fair dealing by terminating the management agreement despite the April 23, 2014 board meeting's amendment.  *Id.* ¶¶ 39–53. IMM also contends that SCA's involvement in Premier's termination of the management agreement makes it liable for intentional interference with IMM's contract, intentional interference with IMM's prospective business relations, unjust enrichment at IMM's expense, and civil conspiracy to commit these wrongful acts.  *Id.* ¶¶ 54–67, 72–75.

Defendants submitted counterclaims against IMM on December 28, 2015 and amended these counterclaims on February 26, 2016.  ECF Nos. 18, 55.  Premier maintains that it was IMM who breached the contract or, in the alternative, was unjustly enriched by failing to provide required services, failing to repay money owed to Premier, failing to pay for Mr. Nichols's health benefits, and improperly delegating tasks it was obligated to perform without paying for their performance.  ECF No. 55, ¶¶ 42–51.  SCA similarly argues that IMM was unjustly enriched by having SCA perform services without compensation that IMM was supposed to perform under the management agreement.  *Id.* ¶¶ 52–56.

At the close of discovery, IMM filed a motion for partial summary judgment against Premier while Premier and SCA each submitted a motion for summary judgment on every one of IMM's claims.  ECF Nos. 108, 110, 112.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

IMM has filed a motion for partial summary judgment on Premier's breach of contract counterclaim based on IMM's alleged failure to repay money owed to Premier. ECF No. 108. Alternatively, or in addition, IMM seeks summary judgment on Premier's entire breach of contract counterclaim. *Id.* Premier moves for summary judgment on IMM's two claims against it: breach of contract and breach of the duty of good faith and fair dealing. ECF No. 110. SCA moves for summary judgment on IMM's other claims: intentional interference with contractual relations, intentional interference with prospective business relations, unjust enrichment, and civil conspiracy. ECF No. 112. The Court will address each motion and claim in turn.

### A.  **IMM's Motion for Partial Summary Judgment**.

IMM seeks summary judgment on Premier's breach of contract counterclaim.  To recover for a breach of contract, Premier must prove "(1) the existence of a contract; (2) performance by [Premier] or some justification for nonperformance; (3) failure to perform the contract by [IMM]; and (4) resulting damages to [Premier]."  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted).  IMM argues that it did not fail to perform when it did not repay alleged advances and, either way, that Premier did not perform its own contractual obligations.

### 1.  **IMM's Repayment of Advances**.

First, Premier asserts that IMM has failed to repay "all monthly $15,000 payments," which were advances rather than earned management fees.  ECF No. 55 at 17, ¶ 24, at 21, ¶ 45.  Premier cites Section 4.01(b) of the management agreement as evidence that IMM was entitled to "advances paid during the year" and an annual adjustment for overpayment or underpayment to yield IMM's "actual management fee."  ECF No. 127, Ex. 1, § 4.01(b).  Premier then points to Section 8.04 of the management agreement, which requires IMM, upon termination of the agreement, to "promptly pay to [Premier] any accrued but unpaid sums due under this Agreement including but not limited to the excess of the advances paid during the year over the actual management fee pursuant to Section 4.01(b)."  ECF No. 127, Ex. 1, § 8.04.

In an April 1, 2013 email, IMM's lawyer acknowledged that IMM "will pay back any overpayment made to it during the year" and requested a monthly payment of $15,000.  ECF No. 127, Ex. 2, at 4.  This request came in response to a proposal to pay IMM $18,000 a month,

indicating that IMM viewed these payments as advances instead of earned management fees. *See id.*

But things changed in April 2014.  The financial statement for 2013 came out around this time and revealed that IMM had not earned any management fees for its work.  ECF No. 127 at 4.  Under the management agreement, IMM would have to repay all of money it had received and potentially perform the rest of the contract *gratis*.  *See* ECF No. 127, Ex. 1, § 4.01(b).  Free labor is quite a bargain, but it is not hard to imagine that Premier could have been worse off if IMM found it cheaper to back out of their deal than spend time and money fulfilling its contractual duties.  In an email chain about Premier's upcoming board meeting, one board member asked: "Now that year end financials are out, will there be a [year] end 'truing up' of management expenses?"  ECF No. 127, Ex. 3, at 1.  Another replied: "I will add item #6 [to the agenda] – 'Truing up of management expenses – how to proceed.'"  *Id.*  At the April 23, 2014 board meeting, Premier agreed to "forgive the 2013 management shortfall" and continue paying IMM $15,000 a month "without additional true-up under the contract."  ECF No. 108, Ex. 5.

Premier and IMM agree that IMM is not on the hook for the 2013 monthly payments, but disagree about subsequent payments.  *See* ECF No. 108 at 12; ECF No. 127 at 5.  According to Premier, "without additional true-up" means only that "Premier would not have to pay IMM more than $15,000 per month for 2014, regardless of whether Premier's profits exceeded the management agreement's threshold."  ECF No. 127 at 5.  Premier's litigation position seems to be that "true-up" is a stand-in for "compensation."  *See, e.g.*, ECF No. 127 at 7 (quoting Premier's attorney interpreting the board minutes as saying IMM "won't *get* an additional true-

up") (emphasis added).  IMM counters that the amendment to the management agreement overrode Section 4.01's provisions for management fees and advances.  ECF No. 108 at 13.

When interpreting a contract, the primary goal is to determine and give effect to the intent of the parties.  *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000).  The parties' intent is to be ascertained primarily from the language of the agreement itself.  *Id.*  The Court gives words their plain and ordinary meaning unless it is clear that the parties intended an alternative interpretation.  *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).  Unless the terms in a contract are susceptible to more than one reasonable interpretation, the Court will not look beyond the four corners of an agreement in determining its meaning.  *Ad Two, Inc.*, 9 P.3d at 376–77.

Here, "pay IMM $15,000 per month . . . without additional true-up under the contract" has only one reasonable interpretation: It means subsequent monthly payments were not subject to the management agreement's provisions for calculating management fees and reconciling payments.  The dictionary definition of "true up" is "to make level, square, balanced, or concentric."  *True*, Merriam-Webster, https://www.merriam-webster.com/dictionary/true. "Square" in turn can mean "settled," and "balance" can mean "to pay the amount due on: settle." *Square*, Merriam-Webster, https://www.merriam-webster.com/dictionary/square; *Balance*, Merriam-Webster, https://www.merriam-webster.com/dictionary/balance.  Thus, the decision that a fixed sum will be paid without further "true-up under the contract" requires suspending Section 4.01, particularly Section 4.01(b)—the provision for settling the difference between advances paid and fees earned.

This reading is reinforced by other language in the board meeting's minutes.  The minutes state that the board's "[d]iscussion included agreeing to *go back* to contract calculation in 2015 once all cost-cutting measures had been implemented."  ECF No. 108, Ex. 5 (emphasis added).  "Contract calculation" refers to Section 4.01, which is titled "Management Fee Computation."  ECF No. 127, Ex. 1, § 4.01.  The parties could not "go back" to using Section 4.01 if they did not first abandon it.

Premier's arguments to the contrary are easily dismissed.  Premier notes that the minutes describe the lack of management fees in 2013 as a "shortfall" but do not explicitly reference a 2014 or 2015 "shortfall."  Of course they do not.  There was no 2014 or 2015 shortfall at the time of the board's meeting.  Instead, the board forgave future shortfalls by indicating that they would no longer "true-up" payments to recover any money that IMM did not earn under the management agreement.

Next, Premier quotes Mr. Nichols's testimony that the minutes do not expressly mention a future "shortfall" and declares that his reading is dispositive.  ECF No. 127 at 7 (quoting *id.*, Ex. 6, at 137:13–20).  It is not.  The interpretation of a contract is a question of law for the Court. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005).  Premier has identified no ambiguity that would permit the Court to consider this extraneous evidence.  And even if it had, Premier twists Mr. Nichols's words out of context.  Mr. Nichols testified that the minutes effectively said IMM will not have to make up any shortfall with the words, as Mr. Nichols remembered them, "all trued up."  ECF No. 141, Ex. 1, at 136:14–137:4.  Additionally, Premier's argument would require the Court to consider that board members used the phrase

"true-up" to include IMM paying back Premier, contradicting its current position that the term

means only Premier's further compensating IMM. *See* ECF No. 127, Ex. 3, at 1.

Premier also makes a big deal about the board's use of the word "additional" in the

phrase "without additional true-up." In Premier's view "[a]ddition is the process of adding, not

subtracting," so "the minutes eliminate any obligation for Premier to *add* to IMM's 2014

compensation." ECF No. 127 at 8 (internal quotation marks omitted). But, again, "true-up" does

not mean "compensate IMM." It means settle any unpaid balance, both overpayment and

underpayment. The entirety of IMM's 2013 compensation was an overpayment that the

management agreement would have returned to Premier, but the board absolved this debt. Thus,

any future settlement of an overpayment or underpayment to IMM would have been an

"additional" true-up. *See Additional, adj. and n.*, Oxford English Dictionary Online,

http://www.oed.com/view/Entry/2188 (defining "additional" as something "[t]hat is in addition

to something else; added, extra, supplementary").

Premier's final textual argument is that the board would have used the phrase "without

contract calculation" if it meant to suspend Section 4.01. Sure, this is one way of saying the

parties are setting aside future overpayments and underpayments. But so is the phrase "without

additional true-up." And Premier has only itself to blame for this choice of the latter phrase.

Premier, not IMM, drafted these minutes. *See* ECF No. 108, Ex. 5. Even if Premier were able to

squeeze ambiguity out of these minutes, Colorado law would require this Court to construe the

contract amendment against Premier as the party who drafted it. *See Christmas v. Cooley*, 406

P.2d 333, 336 (Colo. 1965).

With IMM's entitlement to its 2014 payments firmly established, the question arises of what to do about IMM's 2015 payments.  Premier evidently continued to pay IMM $15,000 a month until termination of their agreement on July 1, 2015 even though the amended agreement called for such payment only "through December 31, 2014."  *See* ECF No. 55 at 17, ¶¶ 23–25; ECF No. 108, Ex. 5.  Premier claims these payments were also advances that must be repaid. *See* ECF No. 55 at 17, ¶¶ 23–25; ECF No. 108, Ex. 6, at 2.

IMM need not repay these 2015 payments either.  Although Premier's board discussed "go[ing] back to contract calculation in 2015 once all cost-cutting measures had been implemented," Premier does not claim that it ever did so.  *See* ECF No. 127 at 9.  Premier's conduct complying with the board meeting's amendment through 2015 belies the possibility that the amendment may have expired at the end of 2014.  *See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 975 (Colo. 2005).  Accordingly, the April 23, 2014 suspension of Section 4.01 remained in effect in 2015.  Furthermore, Section 8.04 ("Monies Due on Termination") expressly relies on the operation of Section 4.01.  It states that upon termination IMM "shall promptly pay to [Premier] any accrued but unpaid sums due . . . pursuant to Section 4.01(b)."  ECF No. 127, Ex. 1, § 8.04.  As a result, Section 8.04's repayment requirement was suspended as well.  Premier offers no evidence that its 2015 payments to IMM were advances apart from the arguments that I have already rejected above.  On this record, IMM's 2015 payments were not subject to Section 4.01 or Section 8.04 of the management agreement, so they were IMM's to keep.

IMM is therefore granted summary judgment on Premier's breach of contract counterclaim regarding repayment of alleged advances.

## 2.   Did Premier Prematurely Terminate the Contract?

IMM's second argument is that Premier's breach of contract claim must fall because Premier has not performed its own obligations under the contract.  *See W. Distrib. Co.*, 841 P.2d at 1058 (Colo. 1992).  IMM argues it has not substantially received the benefit of their bargain because Premier terminated the agreement prematurely in violation of the April 23, 2014 amendment.  Section 8.02(c) of the management agreement allowed either party to terminate their agreement if, among other things, "the management fee payable to [IMM] pursuant to Section 4.01(a) hereof for the period of two full consecutive calendar quarters . . . ending immediately prior to the date notice of such termination is given is less than $100,000 (i.e. an average of $50,000 per quarter)."  ECF No. 127, Ex. 1, § 8.02(c).  However, as discussed above, the board meeting amendment displaced Section 4.01.  *See supra* Part A.1.

IMM contends that "the ability of either party to terminate the Management Agreement under Section 8.02(c) went out the window because *no management fee was ever 'payable* to [IMM] pursuant to Section 4.01(a)' during the two quarter[s] preceding the termination notice." ECF No. 108 at 17.[1]  In IMM's view, the board meeting amendment implicitly suspended Section 8.02(c), the at-will termination provision.  IMM apparently believes Premier was forbidden from terminating their agreement before June 30, 2022 unless an eligible termination event occurred or the contract was further amended.  *See* ECF No. 127, Ex. 1, §§ 1, 8.01–.02.

But IMM's argument is self-defeating.  If no management fees were payable under Section 4.01(a) for the two quarters before Premier's notice of termination, then $0 was payable over that period.  Thus, the amount payable was "less than $100,000," so Premier was free to

---

[1] IMM raises an additional argument in its response to Premier's motion for summary judgment.  *See* ECF No. 122 at 7.  That contention is addressed in Part B.1.

terminate their agreement when it did.  IMM has not identified any textual basis or extrinsic evidence for its belief that Section 4.01's suspension instead impliedly repealed Section 8.02(c).  *See* ECF No. 108 at 16–18; ECF No. 122 at 6–10.

First, the text of the management agreement supports the view that Section 8.02(c) survived the board meeting amendment.  *See Ad Two, Inc.*, 9 P.3d at 376.  Under the traditional rules of interpretation, the agreement's specifying that the amount payable must simply be "less than $100,000" implies that the amount need not be "*greater than $0 but* less than $100,000." *See, e.g.*, *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991) ("The doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.").

The board meeting's minutes similarly support this reading.  Just like contract formation, "[m]odification of an agreement requires the mutual consent of the parties involved." *Reynolds v. Farber*, 577 P.2d 318, 321 (Colo. App. 1978).  However, while the minutes unmistakably reference Section 4.01's "contract calculation," they say nothing about modifying the parties' termination rights.  *See* ECF No. 108, Ex. 5.  This silence suggests that the parties did not intend to repeal Section 8.02(c).  *See Plumbers & Steamfitters*, 932 F.2d at 1449.

In addition, the circumstances attending the board meeting reinforce this understanding of the amendment.  *See Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 146 (Colo. 2006).  Mr. Nichols, IMM's representative on the board, testified that he did not remember anyone at the meeting even mentioning Section 8.02(c).  ECF No. 110, Ex. 3, at 148:8–22.  IMM might as well concede that the parties did not assent to suspending Section 8.02(c).

14

This natural reading of the board meeting's minutes as leaving Section 8.02(c) intact is neither illogical nor unjust.  In April 2014 IMM had yet to earn any management fees.  ECF No. 127 at 4.  IMM admits that it would not have earned any management fees during the entire contract term if Section 4.01 had remained in effect.  ECF No. 108 at 10.  Consequently, even without the amendment Premier could have terminated the contract in the same manner.  The amendment benefited IMM by pledging more compensation than it was entitled to, but did not provide a further benefit by revoking Premier's ability to terminate the contract.

Moreover, the at-will termination provision served both Premier's and IMM's interests.  It begins: "*Either party* may terminate this Agreement for any reason . . . ."  ECF No. 127, Ex. 1, § 8.02(c).  The motive for tying at-will termination to IMM's level of compensation is obvious:  If IMM's share of Premier's profits did not reach $100,000 every two quarters, then Premier's profits were lower than the parties anticipated when they drafted the agreement.  Under these circumstances IMM might have wanted to get out of the contract so that it could earn more money elsewhere, and Premier might have wanted to fire IMM so that it could retain a different manager.  But IMM's reading of the amendment would have bound both IMM and Premier to an unfulfilling agreement until June 30, 2022 absent a qualifying termination event or a superseding contract amendment.  *See* ECF No. 127, Ex. 1, §§ 1, 8.01–.02.

As a result, Premier did not breach the contract, and IMM's motion for summary judgment on Premier's remaining breach of contract counterclaims must be denied.

**B.  Premier's Motion for Summary Judgment.**

Premier has moved for summary judgment on IMM's claims for breach of contract and breach of the duty of good faith and fair dealing.

### 1. Breach of Contract.

IMM's complaint—like its motion for summary judgment on Premier's counterclaims—contends that Premier improperly terminated the management agreement in violation of the board meeting amendment. *Compare* ECF No. 1, ¶¶ 39–46, *with* ECF No. 108 at 16–18. And Premier's motion for summary judgment on IMM's complaint—like its response to IMM's motion—rebuts IMM's allegation. *Compare* ECF No. 110 at 2–7, *with* ECF No. 127 at 6–11. Many of Premier's arguments are unsurprisingly cumulative and need not be recited in light of my earlier finding that Premier did not breach the contract. *See supra* Part A.2. But IMM raises a new defense here that deserves to be addressed, and Premier's motion also attacks the alternative theories of liability in IMM's complaint.

IMM argues that Premier had no right to terminate the contract after the first quarter of 2015 because "such right is contingent on *payment* of fees pursuant to Section 4.01 during the previous two quarters." ECF No. 122 at 7 (emphasis added). As IMM points out, "IMM was paid on a flat fee basis, not pursuant to Section 4.01(a)." *Id.* (emphasis omitted).

However, IMM misreads the management agreement. The at-will termination provision allowed Premier to terminate the contract when "the management fee *payable* to [IMM] pursuant to Section 4.01(a)" was less than $100,000 for the previous two quarters. ECF No. 127, Ex. 1, § 8.02(c) (emphasis added). "Payable" means "that may, can, or must be paid." *Payable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/payable. In contrast, "payment" means "the act of paying." *Payment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/payment. These words are not interchangeable. IMM is therefore wrong to say Premier's termination right was contingent on Premier's actually paying some amount less

than $100,000 under Section 4.01(a) over the course of two quarters.  Instead, that right vested

when less than $100,000 "must be paid" to IMM according to these terms.  Again, no fees were

due to IMM under Section 4.01(a) during the period at issue here, so these requirements were

satisfied.  *See supra* Part A.2.

IMM's alternative theories of liability are equally unavailing.  First, Premier did not

waive its rights under Section 8.02(c).  Waiver requires "the intentional relinquishment of a

known right or privilege."  *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984).  Waiver

must be shown by "a clear, unequivocal, and decisive act of the party demonstrating the

relinquishment."  *Universal Res. Corp. v. Ledford*, 961 P.2d 593, 596 (Colo. App. 1998).  Here,

however, IMM has provided no evidence of Premier's affirmatively acting in a way that might

suggest it waived its rights.

Second, Premier is not equitably estopped from asserting its rights under Section 8.02(c).

Equitable estoppel prevents a party "from enforcing an obligation by taking a position contrary

to a previous representation relied on by [an opposing party] to [its] detriment."  *Crawford v.

McLaughlin*, 473 P.2d 725, 731 (Colo. 1970).  IMM has offered no evidence of Premier assuring

IMM that it would not invoke Section 8.02(c), or of IMM relying on such a representation.

Third, Section 8.02(c) did not foreclose Premier's giving notice of termination on March

3, 2015.  That provision's only time restrictions were: (1) termination must take effect "as of any

date after the end of the Initial Term" on June 30, 2015; (2) the management fees payable to

IMM under Section 4.01(a) must be less than $100,000 for the "two full consecutive calendar

quarters . . . ending immediately prior to the date notice of such termination is given"; and (3) the

terminating party must provide notice at least 120 days before termination.  *See* ECF No. 127,

Ex. 1, § 1.  Properly understood, these three requirements were indisputably satisfied.

Termination took effect on July 1, 2015; the management fees payable to IMM did not reach

$100,000 over the last two periods before March 3, 2015; and March 3, 2015 was at least 120

days before July 1, 2015.  *See* ECF No. 108, Ex. 7; ECF No. 122 at 7.

For all of the reasons discussed above, Premier's motion for summary judgment on

IMM's breach of contract claim is granted.

### 2.  Breach of the Duty of Good Faith and Fair Dealing.

IMM also accuses Premier of violating its duty of good faith and fair dealing by

"manufacturing a baseless ground for terminating its contract with IMM."  ECF No. 1, ¶ 50.

Under Colorado law, the duty of good faith and fair dealing applies "when the manner of

performance under a specific contract term allows for discretion on the part of either party."

*Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  In particular, this doctrine is relevant

"when one party has discretionary authority to determine certain terms of the contract, such as

quantity, price, or time."  *Id.*  Such "[d]iscretion occurs when the parties, at formation, defer a

decision regarding performance terms of the contract."  *Id.*  The covenant of good faith and fair

dealing exists "to enforce the reasonable expectations of the parties."  *Id.* at 499.  However, this

duty "will not contradict terms or conditions for which a party has bargained."  *Id.*

Section 8.02(c) of the management agreement allowed either party to terminate the

agreement "for any reason," provided certain conditions were met.  ECF No. 127, Ex. 1, §

8.02(c).  As discussed above, those conditions were met here.  *See supra* Part B.1.

IMM fails to show that there is a genuine issue for trial on this claim.  IMM does not

allege that the at-will termination provision is a "performance term[]" like "quantity, price, or

time" that would subject it to the duty of good faith and fair dealing.  *See Amoco Oil*, 908 P.2d at

498.  Even if the doctrine did apply, it could not have been not violated when Premier terminated

the agreement because "the reasonable expectations of the parties" when the contract was formed

were that either side might terminate the agreement "for any reason."  *See id.*; ECF No. 127, Ex.

1, § 8.02(c).  And in any event, the parties bargained for the at-will termination provision, so its

plain terms cannot be negated by the duty of good faith and fair dealing.  *See Amoco Oil*, 908

P.2d at 498.

Premier's motion for summary judgment on IMM's duty of good faith and fair dealing

claim is therefore granted.

## C.  SCA's Motion for Summary Judgment.

SCA has moved for summary judgment on the four claims against it: intentional

interference with contractual relations, intentional interference with prospective business

relations, unjust enrichment, and civil conspiracy.

### 1.  Intentional Interference with Contractual Relations.

IMM's complaint first claims that SCA intentionally interfered with IMM's rights under

the management agreement by inducing Premier to breach that contract.  To succeed on a claim

for intentional interference with contractual relations, a plaintiff must show that the defendant

intentionally and improperly caused a third-party to breach a contract with the plaintiff.  *See*

*Warne v. Hall*, 373 P.3d 588, 595 (Colo. 2016).  In IMM's view, SCA wrongfully induced such a

breach by promising to indemnify Premier and its board members against any damages

stemming from Premier's improper termination of the management agreement with IMM.  ECF

No. 126 at 3–4.

But Premier's termination of the management agreement did not breach the contract. *See supra* Parts A.2, B.1. Absent such a breach by Premier, a claim for intentional interference with a contract cannot lie against SCA. Summary judgment must therefore be entered for SCA on this claim.

### 2. Intentional Interference with Prospective Business Relations.

Next, IMM claims SCA intentionally and improperly interfered with the prospective business relationship between IMM and the entity that would be formed as a result of the merger between Premier and Audubon. A claim of intentional interference with prospective business relations requires "a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1119 (10th Cir. 2009) (quoting *MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007). The plaintiff must also show that "there is a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope." *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995).

On the facts presented, no reasonable jury could find that IMM had a "reasonable likelihood" of being hired as the manager of the new Premier-Audubon entity. The Premier-Audubon letter of intent said of the planned merger: "The Parties shall mutually agree on management services to be provided by Jankat and SCA to the Centers after the Closing." ECF No. 112, Ex. 3, § 3(d). Indeed, SCA is in the business of managing surgical centers, and the letter of intent anticipated SCA's ownership interest increasing from 21.5% of Premier to 51% of the new entity while IMM stake was eliminated. *See* ECF No. 1, ¶ 13; ECF No. 112, Ex. 3, §§ 2(a), 3(a). The letter further stated that Audubon and Premier "shall mutually agree upon the

terms and conditions by which the Management Agreement between Premier and [IMM] would

be terminated." ECF No. 112, Ex. 3, § 4(d). Although this letter was not legally enforceable,

*see id.* at 1, it reveals only a trivial chance that IMM might have been hired as a manager instead

of Jankat and SCA.

In addition, IMM has offered no probative evidence to support its belief that the merged

Premier-Audubon entity would hire it. IMM's reliance on the testimony of Dr. Tom Dalsaso,

Jr.—a physician who practiced at Premier's surgical center—is misplaced. *See* ECF No. 126 at

6–7. Although Dr. Dalsaso testified that he personally opposed having SCA manage the center,

he admitted that he was not involved in the negotiation of the Premier-Audubon merger. ECF

No. 123, Ex. B, at 12:13–14, 22:8–12. Dr. Dalsaso also conceded that he did not know of

anyone who was involved in the negotiation and who wanted IMM to manage the new entity. *Id.*

at 22:13–15. Accordingly, IMM has not offered any evidence that is relevant to the question

whether IMM had a reasonable likelihood of being hired by the actual decisionmakers for the

new Premier-Audubon entity. Summary judgment for SCA is therefore warranted on IMM's

intentional interference with prospective business relations claim.

### 3.   Unjust Enrichment.

IMM also alleges unjust enrichment. Under Colorado law, "a party claiming unjust

enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3)

under circumstances that would make it unjust for the defendant to retain the benefit without

commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008). IMM argues

that SCA was unjustly enriched by wrongfully receiving a profitable management contract with

the merged Premier-Audubon entity at IMM's expense.

IMM's unjust enrichment claim fails as a matter of law.  The second prong of the test considers whether the plaintiff suffered a loss or had its rights violated.  *See* Restatement (Third) of Restitution & Unjust Enrichment § 1 cmt. a (2011).  IMM concedes that not getting the desired contract did not amount to a tangible "expense," but instead argues that SCA's gain was the result of an "unfair detriment" to IMM attributable to "the tortious way in which SCA obtained this contract."  ECF No. 126 at 11.  IMM advances no new arguments for this claim and merely directs the Court to its earlier arguments about SCA's allegedly wrongful actions in obtaining its management contract.  *See id.*  However, as discussed above, the undisputed evidence shows that SCA committed no tort and did not violate IMM's rights in acquiring the Premier-Audubon contract.  *See supra* Parts C.1–2.  Summary judgment is therefore required on IMM's unjust enrichment claim.

### 4. Civil Conspiracy.

Last, IMM claims that SCA conspired with others to interfere with IMM's contract and prospective business relations.  In Colorado, civil conspiracy is a "derivative cause of action." *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003).  "If the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself."  *Id.*  Here, IMM cannot show improper interference with IMM's contract with Premier or prospective relationship with the new Premier-Audubon entity.  *See supra* Parts C.1–2.  Summary judgment is thus warranted on IMM's civil conspiracy claim as well.

### ORDER

For the foregoing reasons,

1.  Plaintiff Integrity Medical Management, LLC's Motion for Partial Summary Judgment [ECF No. 108] is GRANTED IN PART and DENIED IN PART.

2.  Defendant Surgical Center at Premier, LLC's Motion for Summary Judgment [ECF No. 110] is GRANTED.

3.  Defendant Surgical Care Affiliates, LLC's Motion for Summary Judgment [ECF No. 112] is GRANTED.

DATED this 30th day of January, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge